# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00763-COA

**CATHERINE BROWN AND ROBERT BROWN**                          **APPELLANTS**

**v.**

**MICHELLE ANN PETRO, M.D. AND**                          **APPELLEES**
**GASTROINTESTINAL ASSOCIATES, P.A.**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/06/2024 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | LAWRENCE JOHN TUCKER JR. |
| | GOODLOE TANKERSLEY LEWIS |
| ATTORNEYS FOR APPELLEES: | MILDRED M. MORRIS |
| | ADRIA LYN JOHNSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 10/21/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1.     In 2022, Catherine Brown (Cathy) went to Dr. Michelle Petro and Gastrointestinal Associates Endoscopy Center LLC (the Center) with a complaint of dysphagia. After examining Cathy, Petro determined that an endoscopy and colonoscopy should be performed. A month before the scheduled surgery, Cathy returned to the Center and executed a Clinic-Physician-Patient Arbitration Agreement (the Agreement). The validity of this Agreement is at issue in this case.

¶2.     Petro performed Cathy's procedures as planned, but Cathy began experiencing abdominal pain soon after leaving Petro's office. Due to her abdominal pain, Cathy and her

husband Robert presented to St. Dominic's hospital, where another physician discovered that Cathy's duodenum wall had been perforated during the procedures Petro performed.

¶3.    Almost two years later, the Browns sued Petro and the Center in the Hinds County Circuit Court for medical malpractice and Robert's alleged loss of consortium, which derived from Petro's alleged negligence.

¶4.    In response to the Browns' complaint, Petro and the Center moved to stay the proceeding and compel arbitration. Specifically, they argued that Cathy's claims were within the scope of the Agreement, as Cathy had agreed to arbitrate "any dispute, claim or controversy arising out of or relating to the performance of medical services, including but not limited to . . . negligence or medical malpractice."

¶5.    Furthermore, Petro and the Center noted that public policy favors arbitration and that to invalidate an arbitration agreement, like any other contract, the plaintiffs must have a contractual defense such as fraud, duress, or unconscionability; but the Browns had claimed no such defense. They also argued that the Agreement expressly noted it would be governed by the Federal Arbitration Act (FAA) and, if not the FAA, then by Mississippi law.

¶6.    The Browns filed a response in opposition to the motion to compel arbitration.[1] In their response, the Browns contested the validity of the Agreement, claiming that it was "not a negotiated agreement evidencing the mutual assent of two or more contracting parties."

---

[1] On this same day, but prior to filing the response, the Browns were advised that Petro's true employer was not the Center but, rather, Gastrointestinal Associates P.A. The defendants informed the Browns that any motion they made to correct the employer would not be opposed; thus, some of the Browns' arguments in this response were premised on Gastrointestinal Associates P.A. being Petro's true employer.

2

They also insisted that for an arbitration agreement to be valid, it must satisfy the six required elements of a contract formation in Mississippi, and the Browns claimed several of those elements were not satisfied by the Agreement.

¶7.    Moreover, the Browns argued that the Agreement was unenforceable and ambiguous since it failed to specify any particular treatment, the date of treatment, or the duration of the Agreement. Furthermore, the Browns argued that in the event the Agreement was binding on Cathy, it was not binding on Robert since he had not signed it or been Petro's patient.

¶8.    Petro and Gastrointestinal Associates P.A. (GI Associates) filed a reply and reiterated their previous arguments for the Agreement's validity. They also claimed Petro was encompassed by reference in the Agreement's plain language, and as a result, her employer, GI Associates, was also covered by the Agreement. Thus, they argued that the procedures Cathy underwent were subject to the Agreement.

¶9.    Following a hearing on the parties' various issues, the circuit court granted the motion to compel arbitration, reasoning that there was a valid and enforceable agreement to arbitrate between the parties. The judge also found mutual assent to the terms of the Agreement by the parties.

¶10.    Specifically, the circuit court reasoned Petro was a party to the Agreement because the first paragraph "encompasse[d] the physician's working in conjunction with [the Center]," "GI manifest[ed] its consent to arbitrate through its conduct of presenting [Cathy] with the arbitration agreement," and Cathy had assented to the Agreement by signing it on March 1, 2022. Lastly, the court held that Robert's "derivative claim of loss of consortium

3

. . . [was] within the scope of the Agreement." We agree with the circuit court and find that a valid, binding, and enforceable arbitration agreement exists and governs the rights of the parties.

## STANDARD OF REVIEW

¶11.   "Appellate courts apply a de novo standard of review to a trial court's decision to grant or deny a motion to compel arbitration." *Diversicare of Meridian LLC v. Shelton*, 334 So. 3d 487, 492-93 (¶15) (Miss. Ct. App. 2022).

## ANALYSIS

¶12.   On appeal the Browns raise three issues related to the Agreement. First, they claim that no enforceable arbitration agreement exists between the parties. Next, they argue that even if an enforceable arbitration agreement exists, Petro and GI Associates are not entitled to enforce it since neither is mentioned by name in the Agreement, and neither signed the Agreement. Lastly, they argue that even if an enforceable arbitration agreement exists and is binding on Cathy, Robert's loss of consortium claim is not subject to the Agreement. We address each of these arguments in turn.

### I.    A Valid Arbitration Agreement

¶13.   The Browns argue that the Agreement Cathy signed is unenforceable as a binding arbitration agreement because it failed to meet the required elements of a valid contract in Mississippi. Specifically, the Browns claim the Agreement was unenforceable because of ambiguity in the Agreement's terms and the absence of mutual assent. Consequently, the Browns claim the circuit court erred by granting Petro and GI Associates' motion to compel

arbitration.

¶14.   "We have adopted the federal policy favoring arbitration, under which any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Caplin Enters. Inc. v. Arrington,* 145 So. 3d 608, 612 (¶7) (Miss. 2014) (internal quotation marks omitted). "As such, arbitration is firmly embedded in both our federal and state laws." *Miss. Care Ctr. of Greenville LLC v. Hinyub*, 975 So. 2d 211, 214 (¶5) (Miss. 2008) (internal quotation mark omitted). "Therefore, arbitration is required unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* at (¶6) (internal quotation marks omitted). Additionally, our Supreme Court has held that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Diversicare*, 334 So. 3d at 493 (¶18). It should also be noted that "[t]he burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *Id.*

¶15.   Our Supreme Court has unquestionably "recognized the well-accepted [FAA] standard for determining the validity and enforceability of an arbitration clause." *Miss. Care Ctr.*, 975 So. 2d at 214 (¶9). The FAA provides a two-pronged inquiry to determine the validity of an arbitration agreement. *See Cleveland v. Mann*, 942 So. 2d 108, 112 (¶9) (Miss. 2006). Prong One looks at whether the parties have agreed to arbitrate the dispute, and Prong Two determines whether state law contract defenses such as fraud, duress, or unconscionability may invalidate the agreement or foreclose arbitration. *Caplin Enters.*, 145 So. 3d at 612-13

(¶¶8-11). Neither party argues that Prong Two applies to the Agreement; most of the Browns' arguments center on issues under Prong One.

¶16.    The first prong has two aspects: "(1) whether there is a valid arbitration agreement, and (2) whether the parties' dispute is within the scope of the arbitration agreement." *Id.* "If we determine that the parties did not agree to arbitrate the dispute, the analysis is at an end." *JP&G LLC v. Voss*, 331 So. 3d 569, 578 (¶19) (Miss. Ct. App. 2021).

¶17.    "To determine if the arbitration agreement is valid, we apply contract law to analyze whether a valid contract exists between the parties." *Caplin Enters.*, 145 So. 3d at 612 (¶9). In Mississippi, the six required elements of a valid contract are "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Id.*  If all six elements of an enforceable contract are present and if the arbitration agreement is valid, we then look to see whether the dispute is within the scope of that agreement.

¶18.    The Browns argue that the Agreement is unenforceable because it is ambiguous in both the identities of the parties (element 1) and the terms of the agreement (element 3). They also claim that these ambiguities, coupled with the fact that Petro, GI Associates, and the Center all failed to sign the Agreement, evidence a lack of mutual assent (element 5) to the Agreement and render it unenforceable. Therefore, our analysis will focus on these aspects of the Agreement.

### A.    Identities of the Parties to the Contract

¶19. The Browns assert that the Agreement is invalid because it is unclear who were parties to the Agreement. In support of this argument, they point out that nothing in the Agreement identifies Cathy as the "Patient." They also claim that Petro and GI Associates cannot be considered parties to the Agreement since neither was mentioned by name in the Agreement, and neither signed it.

¶20. The Supreme Court has held that ordinary principles of contract law are to be employed "to determine whether a valid arbitration agreement exists." *Carrick v. Turner ex rel. Walley*, 298 So. 3d 1006, 1012 (¶20) (Miss. 2020). These principles require that we first "look to the four corners of the contract and at the language the parties used in expressing their agreement." *Gatlin v. Sanderson Farms Inc.*, 953 So. 2d 220, 222 (¶3) (Miss. 2007). "The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Walters Invs. Inc. v. Spell*, 333 So. 3d 61, 70 (¶26) (Miss. Ct. App. 2021). Additionally, "caselaw defines an ambiguity . . . as a susceptibility to two reasonable interpretations." *Id.* at 71 (¶26) (internal quotation marks omitted). If "an instrument's substance is determined to be clear or unambiguous, the parties' intent must be effectuated." *Id.* (internal quotation marks omitted).

¶21. The Supreme Court has also held that a well-settled principle of contract law is that a party's binding acceptance of a contract may be shown by "[her] actions, and any definite and unequivocal course of conduct disclosing that the party has acceded or assented to it, is as binding on [her] as had [s]he endorsed [her] assent in formal writing." *Edwards v. Wurster Oil Co.*, 688 So. 2d 772, 775 (Miss. 1997). "The assent of the parties in the formation of a

contract must necessarily be gathered from their words, acts and outward expressions." *Logan v. RedMed LLC*, 377 So. 3d 956, 965 (¶37) (Miss. 2024).

### 1. "The Patient"

¶22. Here, we find that Cathy's signature on the Agreement directly beneath the space entitled "Signature of Patient/Guardian" is not susceptible to two reasonable interpretations. *See Walters Invs.*, 333 So. 3d at 70 (¶26). The only reasonable interpretation is that Cathy was a party to the Agreement—the "Patient"—and assented to its terms. Even if Cathy's signature were insufficient, her "words, acts and outward expressions" clearly indicate she was the "Patient" covered by the Agreement and demonstrate her assent to the Agreement's terms. Cathy initially saw Petro in early 2022, and the two discussed the possibility of Cathy undergoing a colonoscopy and endoscopy. Cathy returned to Petro's office and signed the Agreement. She then returned to Petro's office for a third time to actually undergo the procedures. We find that Cathy's "definite and unequivocal course of conduct" indicates her assent to the Agreement and that she was a party to the Agreement.

¶23. Perhaps most telling of all is that the Agreement specifically permitted Cathy to withdraw her assent to its terms if she found them objectionable. The Agreement she signed on March 1 stated that it could be "rescinded by written notice by either party within fifteen (15) days of signature. However, any claim or dispute related to medical services rendered after execution of th[e] Agreement and prior to the date of such written notice of rescission shall be subject to the terms of this Agreement." If she did not wish to provide her assent to the Agreement, Cathy could have withdrawn it any time before March 16, 2022. Yet Cathy

8

did not withdraw her consent, and her signature on the Agreement, coupled with the fact she returned for the procedures on March 30, provides evidence of her assent to the Agreement, i.e., the agreement to arbitrate.

### 2. "The Physician"

¶24. Moreover, we find that Petro was included within the Agreement's scope even though her name was not expressly mentioned in it. Looking within the four corners of the Agreement, the first line states that the "Patient, engages Gastrointestinal Associates and Endoscopy Center or employee thereof, and *each Physician that renders medical care*." (Emphasis added). It is undisputed that Petro was the "physician that render[ed] medical care," clearly making Petro a party to the Agreement.

¶25. Additionally, Petro's performance of Cathy's procedures provides evidence of her assent to the Agreement's terms. As noted, "[t]he assent of the parties in the formation of a contract must necessarily be gathered from their words, acts and outward expressions." *Logan*, 377 So. 3d at 965 (¶37). Here, Petro's "acts and outward expressions," performing the colonoscopy and endoscopy, were sufficient to indicate her assent, even without being named in the contract.

### 3. Signature Requirement

¶26. The Browns also claim that the Agreement is unenforceable because it was "not a negotiated agreement evidencing the mutual assent of two or more contracting parties." In making this argument, they rely heavily on *Byrd v. Simmons*, 5 So. 3d 384 (Miss. 2009), for the proposition that mutual assent to a contract's terms is evidenced by signing the contract

9

and note that neither Petro nor GI Associates signed the Agreement. The Browns further rely on *Byrd* to claim that Cathy's signature on the Agreement, which was not countersigned by anyone, amounts to "an offer that was never accepted." However, the Browns' reliance on *Byrd* is misplaced.

¶27. In *Byrd*, the Court held that a "signature is not always essential to the binding force of an agreement." *Byrd*, 5 So. 3d at 389 (¶17). Moreover, in cases following *Byrd*, our Supreme Court has consistently held that "[a] fundamental principle of contract law is that the mutuality of assent to the terms of a contract may be shown by the acts or conduct of the parties where a signature is lacking." *Slater-Moore v. Goeldner*, 113 So. 3d 521, 526 (¶11) (Miss. 2013). Furthermore, "[i]t is a well-settled principle of law that acceptance of a contract as binding upon a party may be shown by [her] actions, and any definite and unequivocal course of conduct disclosing that the party has acceded or assented to it, is as binding on [her] as had [she] endorsed [her] assent in formal writing." *Edwards*, 688 So. 2d at 775 (internal quotation marks omitted).

¶28. Thus, a signature is not the only evidence capable of proving mutual assent. The Court in *Byrd* explained:

> [T]he object of the signature is to show mutuality or assent, but these facts may be shown . . . by the acts or conduct of the parties . . . [and] as to whether those who have signed are bound is generally to be determined by the intention and understanding of the parties at the time of the execution of the instrument.

*Id.*

¶29. In the instant case, because Petro's signature is lacking, we will look to the "acts and conduct" of Petro and Cathy to determine if there was mutual assent to the Agreement's

terms. *Slater-Moore*, 113 So. 3d at 526 (¶11). As explained *supra*, Petro's assent to the agreement can be seen by her conduct, i.e., the performance of the two procedures. Cathy's assent can be seen by her signature on the Agreement and in her conduct. Therefore, even though Petro did not sign the Agreement, her assent to its terms is evident, which nullifies Cathy's argument that her signature on the Agreement was "an offer that was never accepted." The offer was accepted, at the least, by performance, and a counter signature was not required.

¶30. Additionally, the Agreement Cathy signed is distinguishable from the agreement in *Byrd*. The *Byrd* court determined that the signature of both parties was required to make the arbitration agreement binding because the plaintiff was not required to agree to arbitrate in order to be admitted into the facility. *Byrd*, 5 So. 3d at 389 (¶18). The court also reasoned the admission agreement and arbitration agreement at issue were separate agreements that each stood alone, and while the conduct of the defendant's representative (signing the admission agreement and admitting the plaintiff into the facility) indicated assent to the admission agreement, it did not demonstrate assent to the arbitration agreement. *Id.*

¶31. However, the Agreement Cathy signed is different from the one at issue in *Byrd*. The Agreement she signed stated that she agreed to arbitrate "[f]or and in partial consideration of the rendition of any and all present and future medical care and services." Thus, unlike the plaintiff in *Byrd*, who could have been admitted without agreeing to arbitrate, Petro could not have treated Cathy unless she first signed the Agreement. Moreover, Cathy's agreement

11

to arbitrate served as consideration to support the contract, whereas the signatures in *Byrd* did not.

¶32.   The Court in *Byrd* also reasoned that "the record contained no evidence that [the defendant] accepted the arbitration agreement prior to [plaintiff's] initiation of the lawsuit. The first action taken by either party relating to the arbitration agreement after [plaintiff] had signed it was his outright rejection of the agreement by filing suit," rather than pursuing arbitration. *Id.* at 390 (¶18). On the other hand, the record contains evidence that Petro accepted the Agreement prior to the Browns' initiation of the current suit. Petro accepted the day she performed Cathy's procedures, which occurred two years before the Browns filed their suit. Thus, the first action taken by either party relating to the arbitration agreement after Cathy signed it was when Petro accepted the Agreement's terms through the performance of Cathy's colonoscopy and endoscopy. Petro's signature was not required.

### B.   Terms of the Agreement

¶33.   The Browns also claim that the Agreement was ambiguous and therefore unenforceable since it failed to specify any particular treatment, the date of treatment, or the duration of the Agreement. In issues related to ambiguity in a contract, we first "look to the four corners of the contract and at the language the parties used in expressing their agreement." *Gatlin*, 953 So. 2d at 222 (¶3). If "an instrument's substance is determined to be clear or unambiguous, the parties' intent must be effectuated." *Id.* (internal quotation marks omitted). "Where the instrument is not so clear, we will, if possible, harmonize the provisions in accord with the parties' apparent intent." *Id.*

12

¶34.   Although the Agreement did not list a specific treatment, it stated that the terms applied to "any and all present and future medical care and services." Cathy's colonoscopy and endoscopy clearly fall under the umbrella of "medical care and services." There is no ambiguity as to the terms of the Agreement, and the contract is enforceable. *See Gatlin*, 953 So. 2d at 223 (¶9).

¶35.   As far as Cathy's arguments related to the ambiguity of the Agreement's duration, we find the terms of the Agreement sufficiently definite. The Agreement stated that it could be "rescinded by written notice by either party within fifteen (15) days of signature. However, any claim or dispute related to medical services rendered after execution of th[e] Agreement and prior to the date of such written notice of rescission shall be subject to the terms of this Agreement." The duration of the Agreement is plainly stated as beginning on March 16, 2022, i.e., fifteen days after the Agreement was executed, and encompassing any claims related to services rendered after March 16. Again, there is no ambiguity as to the Agreement's duration, and it is an enforceable contract.

¶36.   We find that the Agreement is a valid, enforceable contract. There is no ambiguity in the parties, as Cathy is clearly the patient covered by the Agreement, and Petro is the physician who rendered services. This is proven through Cathy's signatures and both Cathy's and Petro's actions. Nor is there any ambiguity as to the terms of the contract, as the plain language of the contract clearly covers "any medical services" received on any date and sets out the beginning and duration of the Agreement.  The Browns challenge no other aspect of the Agreement.

¶37. Accordingly, we find the first prong of the FAA inquiry—whether the parties have agreed to arbitrate the dispute—has been satisfied. *Caplin Enters.*, 145 So. 3d at 613 (¶8). The Agreement satisfies all six elements of an enforceable contract, and consequently, we find that the Agreement is valid, as there were "two or more contracting parties," "mutual assent," and the terms of the Agreement were "sufficiently definite." We also find the parties' dispute to be within the scope of the arbitration agreement since the Browns' medical negligence claims arose from medical care and service Petro rendered, and the Agreement covered "any dispute, claim or controversy arising out of or relating to the performance of medical services."[2]

## II.     Invocation of the Agreement

¶38. The Browns argue that even if this Court were to find the Agreement valid and enforceable, neither Petro nor GI Associates is entitled to enforce it because they are not named or otherwise identified in the Agreement. They also note that no one other than Cathy signed the Agreement—not even the Center, a named entity in the contract. The Browns acknowledge that there are circumstances where a non-signatory may be able to enforce an arbitration agreement but claim "those circumstances are not present" in this case.

¶39. The Browns have placed great importance on the absence of the defendants' signatures to the Agreement because there is a "general rule that a non-signatory may not be bound by an arbitration contract." *Briovarx LLC v. Transcript Pharm. Inc.*, 163 So. 3d 311,

---

[2] We address this point only for the sake of thoroughness, as none of the parties has claimed the dispute is outside the scope of the Agreement. Nor has any party claimed that Prong Two of the FAA analysis is required.

14

315 (¶16) (Miss. Ct. App. 2015) (citing *Sawyers v. Herrin-Gear Chevrolet Co.*, 26 So. 3d 1026, 1038 (¶31) (Miss. 2010)). However, this rule has "a repeatedly recognized exception." *Id.* The exception is that "'a non-signatory may be able to enforce an arbitration agreement against a signatory where the non-signatory has a close legal relationship with a signatory of the agreement' and where the plaintiff alleges 'substantially interdependent and concerted misconduct' between the signatory and non-signatory." *Id.* (quoting *Sawyers*, 26 So. 3d at 1038 (¶¶31-32)). In *Sawyers*, a "close legal relationship" between a signatory and non-signatory was described as an "alter ego, parent/subsidiary, or agency relationship." *Sawyers*, 26 So. 3d at 1038 (¶32).

¶40.    The Browns argue that the *Sawyers* test (i.e., the exception above) cannot be met and that Petro, as a non-signatory, cannot enforce the arbitration agreement because the Center also is a non-signatory to the contract—they failed to sign it at all.

¶41.    Even if the *Sawyers* test is not satisfied, that alone does not prevent Petro from enforcing the Agreement. As explained *supra*, Petro was a party to the Agreement, and her signature was not necessary to establish her as a party to the Agreement, nor was Petro's signature required to indicate her acceptance of the Agreement's terms. Petro accepted and assented to the Agreement by performance.

¶42.    Since Petro was a party to the Agreement and is now seeking to invoke the Agreement, we are not presented with the typical factual scenario of a non-signatory seeking to enforce an arbitration agreement. Typically, when courts apply the *Sawyers* test the plaintiff and at least one of the named defendants have signed the agreement to arbitrate.

After both the plaintiff and a defendant have signed the agreement to arbitrate, a third-party non-signatory (usually associated with the named defendant), then seeks to enforce the arbitration provision.

¶43.    In the instant case, as the Browns point out, no one other than Cathy signed the Agreement. Therefore, we find the *Sawyers* test inapplicable to the facts of the case. Rather, we find the Supreme Court's reasoning in *Qualcomm Inc. v. American Wireless License Group LLC*, 980 So. 2d 261 (Miss. 2007), to be more useful in the present case. In *Qualcomm*, the Supreme Court was "faced with the unique situation of non-signatories attempting to enforce an arbitration provision against other non-signatories." *Id.* at 269 (¶16). Instead of focusing on the *Sawyers* test, the Court in *Qualcomm* discussed the exception to the general rule that non-signatories may not enforce arbitration agreements against signatories and then reasoned that the issue of which parties could invoke the arbitration provision was "a rather simple question of contract interpretation." *Id.* at (¶¶17-18). After examining the plain language of the contract, the Court held:

> By the plain terms of the contract, it is evident that the parties simply did not agree to extend to non-signatories the benefit of the arbitration clause . . . . The contract clearly reads that disputes may be submitted to arbitration at the election of either Buyer or Seller. Because the defendants are neither the Buyer nor Seller, they are not entitled to enforce arbitration. As we have stated before, this Court must accept the plain meaning of a contract as the intent of the parties if no ambiguity exists.

*Id.* at (¶18).

¶44.    Looking at the plain language of the Agreement Cathy signed, we find that Petro is entitled to invoke arbitration despite being a non-signatory. The Agreement applied to "each

16

Physician that renders medical care and services . . . in conjunction with Patient's medical care," and as discussed *supra*, Petro was the physician who provided Cathy's medical care and services. Additionally, the Agreement stated:

> In the event of a dispute, claim or controversy arising out of or relating to the performance of medical services, including but not limited to patient fees, informed consent, negligence or medical malpractice, between Patient (whether a minor or an adult) or the heirs-at-law or personal representative of Patient, as the case may be, and the Gastrointestinal Associates and Endoscopy Center and each Physician individually, where the claim or amount in controversy exceeds $5,000, such dispute or controversy shall be submitted to JAMS . . . or its successor. . . . Either party may initiate arbitration of any matter subject to arbitration by filing a written demand for arbitration at any time.

¶45. Again, the phrase "each Physician individually" clearly includes Petro. Just as the Court in *Qualcomm* held that it was "evident that the parties simply did not agree to extend to non-signatories the benefit of the arbitration clause," we find it evident that as the physician who treated Cathy, Petro is entitled to the benefit of the arbitration clause. *Id.* at 269 (¶18).

¶46. Furthermore, unlike the arbitration agreement at issue in *Qualcomm*, which could only be invoked by the buyer or seller, the Agreement Cathy signed was not as limited. The Agreement stated, "[E]ither party may initiate arbitration on any matter subject to arbitration." Although "either party" is not clearly defined, we find that the repeated use of "physician" in the Agreement was a clear and unambiguous attempt to include physicians like Petro within the Agreement. As previously discussed, if "an instrument's substance is determined to be clear or unambiguous, the parties' intent must be effectuated." *Gatlin*, 953 So. 2d at 222 (¶3).

17

### III. Loss of Consortium

¶47. The Browns argue that even if Cathy is required to submit her claims to arbitration, Robert is not required to submit his claims to arbitration because his loss of consortium claim is "separate and distinct" from Cathy's claim. The Browns argue that the Agreement was binding on "patients" who received "medical care and services" and emphasize that Robert did not receive medical care or services and was never a patient. Additionally, they claim the Agreement cannot be binding on Robert, as no contract was formed between Robert and Petro or GI Associates (or The Center). Thus, the Browns claim the circuit court erred in holding that "[Robert's] derivative claim of loss of consortium is within the scope of the agreement."

¶48. However, we have held that a claim for loss of consortium is a derivative claim dependent on the underlying tort claim, so "[t]he spouse seeking compensation for loss of consortium must show that he or she suffered damages arising out of the other's injuries." *Dillon v. PiCo Inc.*, 239 So. 3d 527, 535-36 (¶26) (Miss. Ct. App. 2017) (internal quotation marks omitted).[3] Mississippi courts have long held that "a defense available against a plaintiff in his or her personal-injury action . . . is available against the spouse's derivative consortium action." *Byrd v. Matthews*, 571 So. 2d 258, 261 (Miss. 1990) (holding that since the defense of assumption was available against the plaintiff in a personal injury action, that same defense was available against the spouse's derivative consortium action).

---

[3] The case the dissent relies on does not address the specific issue in the instant case—whether the defense of arbitration can be employed against a loss of consortium claim—and, instead, broadly discusses the derivative nature of consortium claims. *See Rylee v. Progressive Gulf Ins. Co.*, 224 So. 3d 535 (Miss. 2017).

¶49. Our Supreme Court has also stated that "consortium action are derivative actions subject to all defenses that would have been available against the injured person." *Choctaw Inc. v. Wichner*, 521 So. 2d 878, 882 (Miss. 1988).

¶50. Additionally, our Supreme Court has adopted the following principle articulated by the United States Court of Appeals for the Fifth Circuit:

> It does not follow . . . that under the Federal Arbitration Act an obligation to arbitrate attaches only to one who has personally signed the written provision. We have made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by ordinary principles of contract and agency.

*Terminix Inter. Inc. v. Rice*, 904 So. 2d 1051, 1058 (¶27) (Miss. 2004) (citing *Washington Mut. Fin. Grp. LLC v. Bailey*, 364 F.3d 260, 266 (5th Cir. 2004)).

¶51. In their initial complaint, the Browns asserted that Robert had "a derivative claim for loss of consortium arising from the injury suffered by his wife Cathy." Therefore, we must assess Robert's claim in relation to Cathy's. As outlined above, we find that Cathy's claims are subject to the Agreement. In turn, this means that the defense of arbitration, which was available to be used against Cathy, can also be used against Robert. Consequently, Robert's claim for loss of consortium is subject to the Agreement. *See generally Matthews*, 571 So. 2d at 261.

¶52. We also find unpersuasive the Browns' claim that Robert is not subject to the Agreement since he did not sign it. The Agreement states the FAA will apply, and even though Robert is a non-signatory, he is bound to the Agreement by the dictates of ordinary contract principles. *Terminix*, 904 So. 2d at 1058 (¶27). Ordinary contract principles require contracts to be interpreted according to their plain language, and the Agreement covers "any

dispute, claim or controversy arising out of or relating to the performance of medical services." The Browns' complaint states Robert's claim arises from "the injury" Cathy suffered, and the phrase "the injury" clearly refers to the medical services Petro performed on Cathy. As such, Robert's loss of consortium claim is subject to the Agreement.

## IV. Respondeat Superior

¶53. Although much of the parties' focus has been on Cathy's or Petro's actions, we note that the Browns have also sued GI Associates under a theory of respondeat superior, which "is a derivative claim arising solely out of the negligent conduct of its employee within the scope of his or her employment." *Dillon*, 239 So. 3d at 535 (¶26). Thus, just as Robert's derivative claim is subject to the defense of arbitration, GI Associates may use arbitration in the derivative liability claim. *See Norton v. United States*, 581 F.2d 390, 397 n.13 (4th Cir. 1978) ("[E]mployers are generally entitled under traditional principles of respondeat superior to assert all defenses available to their employees.").

## CONCLUSION

¶54. The Agreement Cathy signed was a valid and enforceable agreement. Thus, the circuit court did not err in granting the motion to compel arbitration. The Agreement satisfied all six required elements of a valid contract in Mississippi and both prongs of the FAA inquiry. Any claim that there was a lack of mutual assent is undercut by Cathy's signature on the Agreement, coupled with her conduct and the conduct of Petro.

¶55. Moreover, the absence of Petro's signature on the Agreement is not fatal to its validity. Petro was included in the scope of the Agreement's protections as she was the

20

"physician" who provided "medical care and services" to Cathy, also known as the "Patient" in the Agreement. Lastly, Robert's claim for loss of consortium cannot be maintained in the circuit court without Cathy's because his claim was derived from hers, and "consortium [actions] are treated as derivative actions subject to all defenses that [are] available against the injured person." *Choctaw Inc.*, 521 So. 2d at 881. Since the Agreement can be used against Cathy's claims, it can also be used as a defense against Robert's claims. GI Associates may also claim the same defenses available to Cathy, and the arbitration agreement is enforceable as to Cathy's claims against GI Associates.

¶56. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., EMFINGER AND WEDDLE, JJ., CONCUR. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD AND McCARTY, JJ. BARNES, C.J., NOT PARTICIPAING.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶57. I concur with the majority that Cathy's claims were subject to the arbitration agreement that she signed and never revoked.[4] I respectfully dissent from the majority's

---

[4] Cathy did not raise a procedural or substantive unconscionability claim in connection with the formation of the arbitration agreement, but when a person arbitrates to receive medical care, it could certainly create a contract of adhesion. "Contracts of adhesion can be procedurally unconscionable." *Massey v. Oasis Health & Rehab. of Yazoo City LLC*, 269 So. 3d 1242, 1253 (¶29) (Miss. Ct. App. 2018) (quoting *La. Extended Care Ctrs. LLC v. Bindon*, 180 So. 3d 791, 795 (¶11) (Miss. Ct. App. 2015)). "Procedural unconscionability is established by showing a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms." *Id.* (quoting *Smith v. Express Check Advance of Miss. LLC*, 153 So. 3d 601, 609 (¶24) (Miss. 2014)). "A substantively unconscionable contract is one that 'affronts the sense of decency' and is 'so unreasonably favorable to one party that [it] imposes oppressive terms on the weaker part.'" *Id.* at 1254 (¶32). Although this issue is not before this Court, such

holding that Robert's claim for loss of consortium was subject to that same arbitration agreement, which he never signed, legally accepted, or agreed to. Chief Justice John Roberts recently wrote:

> The right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'

*Perttu v. Richards*, 605 U.S. 460, 467 (2025) (quoting *SEC v. Jarkesy*, 603 U.S. 109, 121 (2024)). Indeed, "the right to maintain inviolate the jury trial has been written in blood, with the point of the sword, as the final declaration of freemen on the subject." *Godwin v. State*, 73 Miss. 873, 19 So. 712, 715 (1896). Both our federal and state constitutions secure to persons the right to have cases tried before a fair and impartial jury. U.S. Const. amend. VII; Miss. Const. art. 3, § 31.

¶58.    In *Coho Resources Inc. v. McCarthy*, 829 So. 2d 1 (Miss. 2002), the Mississippi Supreme Court held:

> A cause of action accruing to a party for loss of consortium is separate and distinct from that party's spouse suffering personal injury. The spouse seeking compensation for loss of consortium must show that he or she suffered damages arising out of the other's injuries[.]

*Id.* at 22 (¶66) (emphasis omitted) (quoting *Alldread v. Bailey*, 626 So. 2d 99, 102 (Miss. 1993)).

¶59.    The Mississippi Supreme Court reaffirmed *Coho* in *Rylee v. Progressive Gulf Ins. Co.*, 224 So. 3d 535, 538 (¶16) (Miss. 2017). In that case, the Rylees argued that a claim of loss

agreements may raise significant concerns where individuals seeking medical treatment to improve their health and well-being are required to waive their constitutional right to a jury trial as a condition of care.

22

of consortium cannot be both "separate and distinct" and "derivative." *Id.* The Mississippi Supreme Court explained that according to *Coho*, a loss of consortium claim is unique in that it is both "'separate and distinct' **and** derivative" since "it requires the claimant prove separate and distinct damages that derive from, or arise out of, the nonclaimant's bodily injuries." *Id*. (emphasis added) (quoting *Coho*, 829 So. 2d at 22 (¶66)).

¶60.    Robert's claim for loss of consortium constituted his claim for his damages. While it necessarily derives from Cathy's injuries, his claim seeks redress for the unique and personal harm that Robert himself endured. Robert never signed the arbitration agreement with the doctors' group that performed Cathy's medical procedure. He never intimated or legally agreed to waive his constitutional right to a jury trial.  Robert, like every citizen in our state, has a constitutional right to a jury trial under both the United States and Mississippi Constitutions. To compel Robert to arbitrate when he never signed the arbitration agreement or indicated in any way his legal acceptance of such an agreement would improperly hinder and violate his constitutional right to a trial by jury.

**WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**